## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| H.L., by and through his parents, J.L. and J.L., and J.L. and J.L., individually, | : : : : | |
| Plaintiffs, | : : | |
| v. | : : | 3:20-CV-1125 (JUDGE MARIANI) |
| TRI-VALLEY SCHOOL DISTRICT, | : : : | |
| Defendant. | : : | |

FILED
SCRANTON

MAR 1 4 2023

PER _____
DEPUTY CLERK

## MEMORANDUM OPINION

### I. INTRODUCTION

Before the Court are cross-motions for judgment on the administrative record with respect to a claim that H.L., a student in the Tri-Valley School District (the "District"), was denied a free appropriate public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA"). H.L. brings his claim against the District by and through his parents, J.L. and J.L. ("Parents"), who also sue in their individual capacities.

Plaintiffs initiated the action by filing a request for a due process hearing with the District. The hearing request, dated December 6, 2019, alleged the District failed to provide H.L. a FAPE starting in December 2017, and requested the development of an appropriate educational placement and an award of compensatory education. (Doc. 8-7, S-1 at 3–4.)[1]

---

[1] Where feasible, the Court uses the same abbreviations the parties and the Hearing Officer have used. All exhibits designated with "S" are the District's exhibits from the due process hearing, whereas

A two-day due process hearing (the "Hearing") was held on February 10, 2020, and March 9, 2020, at which the parties presented witnesses and documentary evidence. Following the Hearing, Hearing Officer Charles W. Jelley, Esq. ("Hearing Officer" or "ALJ Jelley") ruled in favor of the District and against the Plaintiffs. His findings of fact and conclusions of law are memorialized in his decision (the "Administrative Decision" or "AD") dated May 1, 2020. (Doc. 8-2.)

Plaintiffs appealed the Administrative Decision by filing a complaint in federal court, as permitted by 20 U.S.C. § 1415(i)(2)(A), on July 2, 2020. (Doc. 1.) Plaintiffs ask the Court to "[r]everse the decision of the Hearing Officer and order all relief that is appropriate under the IDEA, including but not limited to compensatory education and revisions to the IEP" as well as attorneys' fees and costs. (*Id.* at 10.) In Plaintiffs' Brief in Support of their Motion for Judgment on the Administrative Record, they specifically request "compensatory education for every hour of the school day that H.L. attended school from December 6, 2017 through October 12, 2019, and one hour of compensatory education for each day from October 12, 2019 through the end of the 2019–20 school year." (Doc. 12-2 at 15.) On October 16, 2020, this Court adopted the parties' stipulation setting forth a briefing schedule and demonstrating their intent to "proceed for disposition upon the administrative record without introducing additional evidence." (Doc. 10.)

---

exhibits designated with "P" are the Parents' exhibits. "N.T." refers to "Notes of Testimony," *i.e.* the due process hearing transcript.

The parties subsequently filed motions for judgment on the administrative record (the "Record").  (Pls. Mot. for Judgment on the Admin. Rec. Doc. 12; Defs. Mot. for Judgment on the Admin. Rec., Doc. 13.)  The Record is filed under seal at Doc. 8.  Having reviewed the motions and briefs filed therewith, as well as the Record and the Administrative Decision, the Court concludes there is no basis to disturb the Administrative Decision.  Therefore, Defendant's motion will be granted, Plaintiffs' motion will be denied, and judgment will be entered in favor of Defendant.

## II. STANDARD OF REVIEW

The IDEA permits "[any] party aggrieved by the findings and decision" of the state administrative hearing "to bring a civil action" in "any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy."  20 U.S.C. § 1415(i)(2)(A).  In reviewing the complaint, a court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).  The United States Supreme Court has construed 20 U.S.C. § 1415(i)(2)(C) to require a district court to give "due weight" to the administrative proceedings, while being careful to avoid replacing its "own notion of sound educational policy for those of the school authorities [that] they review."  *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982).

Consequently, a district court's review of a hearing officer's decision in an IDEA case is "subject to a unique standard of review." *N.M. v. Cent. York Sch. Dist.*, No. 09-969, 2010 WL 4867552, at *4 (M.D. Pa. Sept. 10, 2010). "Due weight" requires the district court to conduct a "modified *de novo* review," under which findings of fact from the administrative proceedings "are to be considered *prima facie* correct." *S.H. v. State-Operated Sch. Dist.*, 336 F.3d 260, 270 (3d Cir. 2003) (quoting *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 758 (3d Cir. 1995)). Under the standard, a court may disagree with the facts found by a hearing officer but must explain any such divergence from the administrative findings. *Id.* (citing *MM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 530–31 (4th Cir. 2002)). Additionally, "a District Court must accept the state agency's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion.'" *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (quoting *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995)) (emphasis in original). A hearing officer's conclusions with respect to whether a school district fulfilled its FAPE obligations, whether the IEP conferred a meaningful benefit, and whether the IEP is appropriate are questions of fact. *See P.P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009) (citing *S.H.*, 336 F.3d at 269–70); *see also Carlisle Area Sch.*, 62 F.3d at 526. The party challenging the administrative decision in the district court bears the burden of persuasion. *See Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012).

In contrast, the district court's review of a hearing officer's findings of law is plenary,

4

and no deference is given to the hearing officer's legal holdings. *See Jana K. v. Annville-Cleona Sch. Dist.*, 39 F. Supp. 3d 584, 594 (M.D. Pa. 2014) (citing *Warren G. v. Cumberland Cnty. Sch. Dist.*, 190 F.3d 80, 83 (3d Cir. 1999)). A hearing officer's conclusions regarding compensatory education are considered findings of law subject to the district court's plenary review. *See P.P.*, 585 F.3d at 735.

## III. BACKGROUND

### A. Factual Background

Because the parties presented this Court with no additional evidence, the factual background below is substantially drawn from ALJ Jelley's findings of fact as recited in the Administrative Decision. However, as relevant, the Court incorporates non-testimonial evidence from the Record that ALJ Jelley did not reference in his findings of fact.

### 1. Pre-2017[2]

H.L. was born in 2005 and resides in the Tri-Valley School District. (Doc. 8-7, S-1 at 1.) Starting in kindergarten and through third grade, H.L. was involved in several disciplinary incidents at school. (Sept. 2015 Evaluation Report, Doc. 8-7, S-5 ("Sept. 2015 ER") at 4.) Following an incident resulting in a ten-day suspension in 2015, Parents obtained a private psychological evaluation for H.L. (*Id.*; AD at ¶ 1.) In August 2015, the evaluator concluded H.L. did not meet the specific criteria for Attention Deficit Hyperactivity

---

[2] Plaintiffs' claims are based on H.L.'s experience starting in December 2017. This information is included as useful background.

Disorder ("ADHD"), but diagnosed him with Other Specific ADHD and with Oppositional

Defiant Disorder ("ODD").  (AD at ¶ 1.)

The evaluator recommended "family treatment," which Parents did not pursue.  (*Id.*

at ¶ 2–3.)  H.L. had been seeing a private counselor but stopped at some point in 2015

"because [H.L.] did not work well with her." (*Id.* at ¶ 4.)  H.L. did receive counseling services

provided by the District at Parents' request. (*Id.* at ¶ 5.)

Following H.L.'s diagnoses and at the beginning of his fourth grade year, the District

completed an Evaluation Report.  (Sept. 2015 ER.)  The Evaluation Report determined that

H.L. was eligible for special education and related services under the IDEA category of

"Other Health Impairment" ("OHI").[3]  (*Id.* at ¶ 6; Doc. 13 at ¶ 10.)  The Record is limited with

respect to H.L.'s experience in fourth and fifth grade.

### 2. 2017–18 School Year: Sixth Grade

#### a. September 2017 IEP

---

[3] "Other health impairment" is defined as

having limited strength, vitality, or alertness, including a heightened alertness to
environmental stimuli, that results in limited alertness with respect to the educational
environment, that—
    (i) Is due to chronic or acute health problems such as asthma, attention deficit
    disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart
    condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle
    cell anemia, and Tourette syndrome; and
    (ii) Adversely affects a child's educational performance.

34 C.F.R. § 300.8(8).

H.L.'s Individualized Education Plan ("IEP") Team convened a meeting on September 22, 2017, soon after he began sixth grade.  (AD at ¶ 8.)  The IEP Team included Parents, a social services representative, a special education teacher, the District's Director of Special Education, and one of H.L.'s regular education teachers.  (Sept. 2017 IEP at 3.) In preparing H.L.'s IEP, among other information, the IEP Team considered reports submitted by H.L.'s teachers on H.L.'s performance over the first few weeks of sixth grade. (Doc. 13 at ¶ 14.)  The reports included both substantive comments and ratings in various categories.  (Sept. 2017 IEP at 3.)  All of H.L.'s educators rated him either "good" or "excellent" in each of the sixteen categories.  (*Id.* at 9–12.)

Together, the Team developed an IEP with "behavior, writing and vocabulary goals, and . . . a substantial amount of specially designed instruction ["SDI"] related to behavior management and self-regulation."  (AD at ¶ 8.)  The IEP included one behavioral goal, which reads:

> Given clear expectations of school and classroom rules and taught self-regulation strategies, [H.L.] will remain compliant in the school setting to continue to maintain discipline referrals at zero for the remainder of this IEP as measured by teacher observation/office discipline referrals daily (baseline 0 discipline referrals for 2017/18 to date)[.]

(Sept. 2017 IEP, Doc. 8-7, S-10 at 23.)  The Team considered this a "maintenance goal" because H.L. had "made progress with behaviors" and had received no discipline referrals so far that school year, nor any while in fifth grade.  (AD at ¶ 9; Sept. 2017 IEP at 12.)  The team, including Parents, "agree[d] that [H.L.]'s behavior in school no longer warrant[ed] an

7

individualized behavior plan at this time." (Sept. 2017 IEP at 15.)  The "individualized behavior plan" that had been in place for H.L. was therefore discontinued.  (*Id.*)

Still, the September 2017 IEP included many strategies for addressing H.L.'s behavior.  H.L. would "receive[] [i]tinerant learning support services two times per month for thirty minutes per session."  (AD at ¶ 10.)   H.L. would also receive social skills services in thirty-minute meetings with the District's social worker once per month.  (*Id.*)  H.L. did not want to visit the social worker more frequently, because he "did not want to look different than the other students" in the school.  (*Id.* at ¶ 14.)  And H.L. would continue to be supported by an aide who assisted with taking breaks as needed.  (*Id.* at ¶ 11.)  Finally, the IEP included numerous SDIs to be employed by the District staff that were aimed at, for example, "reinforc[ing] appropriate behavior," "encourag[ing] compliance," "increas[ing] participation," and assisting with "focus" and "self-regulation."[4]  (Sept. 2017 IEP at 26–28.)

H.L.'s mother signed the Notice of Recommended Educational Placement ("NOREP"), indicating her approval and consent to the implementation of the IEP.  (AD at ¶ 13; Doc. 8-7, S-11.)  The September 2017 IEP thereafter went into effect.

---

[4] To name a few: "use of positive behavioral supports within the school setting such as dawg treats (coupons to buy items in the school store), opportunities to earn activity of his choice with the social worker to reinforce appropriate behavior"; "positive verbal reminders to use taught self[-]regulation strategies along with prompts and cues to encourage compliance"; "When [H.L.] is noncompliant use 'first [then] language' before starting the activity to increase participation"; "planned ignoring of minor behaviors to increase compliance"; "Provide [H.L.] with [two] choices to increase compliance"; and "provide opportunities for legal movement/short breaks in the classroom to assist with self[-]regulation."  (Sept. 2017 IEP at 26, 27.)

During the first half of H.L.'s sixth grade year, he received no disciplinary referrals. (May 18, 2018 Reevaluation Report, Doc. 8-7, S-12 ("May 2018 RR") at 5.)  In the third marking period, H.L. received one disciplinary referral.  (*Id.*)  In the fourth marking period, H.L. received three or four disciplinary referrals, for "bus violations" and failure to follow directions.[5]  (*See id.*)

At some point in April 2018, H.L. began seeing a private counselor again, "but the counselor stopped providing service because [H.L.] needed a more qualified counselor." (AD at ¶ 15.)  Parents did not provide any information to the District from any of H.L.'s private counselors.  (*Id.* at ¶ 17.)

### b. May 2018 Reevaluation Report

On May 18, 2018, the District completed H.L.'s three-year Reevaluation Report, as required by the IDEA.  20 U.S.C. § 1414(a)(2)(B)(ii).  The May 2018 RR incorporates "current information about [H.L.] from teachers, [his] guidance counselor, social worker, librarian, and Parents" that reveals H.L.'s "ongoing behavioral and self-regulation difficulties."  (AD at ¶¶ 18, 20.)

The District social worker "indicated that [H.L.] continued to struggle with peer relationships."  (AD at ¶ 34.)  She noted further that "improvements need to be made

---

[5] The May 2018 RR states that H.L. "had 3 discipline referrals" in the fourth marking period, but goes on to describe four incidents.  (May 2018 RR at 5.)

regarding positive interactions, communication skills, taking accountability for choices, learning self-regulation, coping strategies and organization strategies." (*Id.*)

Teachers' comments in the RR indicated that H.L. "did not work well with others and bothered others." (*Id.*)  H.L. "rushed through work, displayed difficulty with anger management[, . . .] did not control emotions in school," and "became angry and rude with other students and aides." (*Id.*)  Further, teachers reported that H.L. became "oppositional and defiant" at times, and would be "disrespectful to staff, refuse[] to participate in work, was easily distracted and lacked organizational skills." (*Id.*)  Overall, H.L. "was not able to self-regulate and maintain appropriate behavior in structured and unstructured environments." (*Id.*)

The May 2018 RR indicated that H.L. was performing "at or close to grade-level" in all of his academic subjects. (*Id.* at 19.)  The RR concluded that H.L. remained eligible for special education services under the OHI category of the IDEA. (*Id.*)

### c. June 2018 IEP

The IEP Team met to develop a new IEP for H.L. on May 29, 2018, following the completion of the May 2018 RR. (AD at ¶ 24.)  Heading into the meeting, "Parents were concerned about [H.L.] moving up to the junior-senior high school and the need to move from teacher to teacher." (*Id.* at ¶ 23.)  They "were also concerned that there would not be an aide to assist" H.L. in the new school. (*Id.*)

The IEP Team discussed the disciplinary issues that arose toward the end of the school year, as illustrated in the May 2018 RR. (AD at ¶ 26.) The Team, including Parents, concluded that H.L.'s "behaviors were an isolated few that did not impede his or others' learning." (*Id.*) Considering the "frequency and severity of [H.L.]'s behavior," the Team "determined a [Positive Behavior Support Plan ("PBSP")] was not necessary and Parents agreed." (*Id.* at ¶ 29.)

But as with the previous IEP, the June 1, 2018 IEP is not silent with respect to H.L.'s behavioral issues. For example, the IEP notes that "the transition between classes in the Junior/Senior High School would provide [H.L.] with beneficial movement breaks." (AD at ¶ 27; June 1, 2018 IEP, Doc. 8-7, S-18 ("June 2018 IEP") at 19.)[6] And the IEP acknowledges that while no "behavior plan" is required, H.L.'s "behavior will be addressed through goals and [SDIs]." (June 2018 IEP at 18.) For example, because the Team viewed "the few behaviors exhibited as generally isolated to the bus," Parents "requested a shorte[r] bus ride." (*Id.* at ¶ 28.) The District agreed to address this, and the Team added an SDI to the IEP: "Opportunity to alternate form of transportation in the morning/afternoon (to/from school) to minimize time on school transportation to reduce opportunity for behavior issues (minimize time to no more than 40 minutes under normal circumstances)." (June 2018 IEP at 29.) To implement this SDI, "the District could have provided van transportation," but

---

[6] The parties sometimes refer to this as the "May 2018 IEP," presumably because the corresponding IEP Team meeting was held in late May.

Parents and H.L. "did not want to look different than anybody else [and] didn't want to do the van." (Doc. 13 at ¶ 37 (quoting N.T. vol. II at 448:2–4).)  So, the District altered the entire bus route to minimize H.L.'s time on the bus. (AD at ¶ 28; Doc. 13 at ¶ 38 (citing N.T. vol. II at 448:4–7).)

Similarly, "the fact that [H.L.] did not like being pulled out of regular education for itinerant support" affected several of the IEP Team's decisions. (AD at ¶ 25.) For example, the Team reduced his learning support services from two to one meeting per month, and instead of a second formal meeting, the District made a special education teacher available for H.L. to consult as needed during his study hall. (*Id.*) The District also offered H.L. "access to the resource room for tests, homework completion, and other support . . . but [Parents] did not agree." (AD at ¶ 32.) The June 2018 IEP accordingly did not provide access to the resource room.

The IEP Team also considered requiring H.L. to attend a "monthly social skills group." (Doc. 13 at ¶ 39 (citing N.T. vol. II at 443:1–2).) They ultimately declined to because Parents "worried that H.L. would pick up 'behaviors' from the other students in the group." (*Id.*; *see also* AD at ¶ 25.) However, the IEP provided that H.L. would continue to receive social work services one time per month for thirty minutes per session. (AD at ¶ 31.)

Finally, the June 2018 IEP included a revised version of the previous IEP's behavioral goal. Instead of "maintain[ing] discipline referrals at zero," H.L.'s new goal was

to "increase compliance in the school setting by decreasing referrals to zero," from a baseline of four discipline referrals during the 2017–18 school year.  (June 2018 IEP at 27.) As with the previous goal, H.L.'s progress toward meeting this goal would be measured by "teacher observation/recording of discipline referrals quarterly."  (*Id.*)

H.L.'s mother again signed the NOREP, indicating her approval of the June 2018 IEP.  (Doc. 8-7, S-19.)

### 3. 2018–19 School Year: Seventh Grade

During H.L.'s first week of seventh grade, "Parents were concerned [H.L.] was not getting on the bus home from school and requested the school staff escort [him] to the bus." (AD at ¶ 36.)  The District thereafter provided H.L. an escort to the bus.  (*See id.*)  After a short time, "Parents requested that the escort stop" because H.L. "did not want the escort." (*Id.*)

At some point in September 2018, H.L. "had an intake meeting at a private outpatient community based behavioral health provider."  (*Id.* at ¶ 37.)  He was also seeing an outside counselor and was "reportedly doing otherwise well with that counselor."  (*Id.*)  For that reason, the District "limited school counseling."  (*Id.*)

By early October 2018, H.L. had already accumulated three disciplinary referrals since the beginning of the school year.  (October 5, 2018 Revision to May 2018 IEP, Doc. 8-7, S-20 ("Oct. 2018 Rev. IEP") at 5.)  Two referrals were for "disruptive behavior" and one was for "a dangerous incident in the cafeteria."  (Oct. 2018 Rev. IEP at 5.)  H.L.'s mother

emailed the District social worker on October 4, 2018, expressing her concern that "minor issues are being made into disapline [sic] referrals." (Doc. 8-8, S-38 at 2.)

### a. October 2018 Revision to May 2018 IEP

The IEP Team convened a meeting on October 5, 2018. (Oct. 2018 Rev. IEP.) In addition to H.L.'s discipline referrals, the IEP Team discussed and sought to address issues relating to his failure to complete his homework and, generally, his "in school self-regulation of behavior." (AD at ¶ 39.)

As an initial matter, the IEP Team agreed at the October 5 meeting to complete a Functional Behavioral Assessment ("FBA"). (AD at ¶ 45.) "After the meeting, Parents requested that the [I]ntermediate [U]nit complete the FBA, and the [District] agreed." (*Id.*) The results of the FBA would not be available until December 2018. (*Id.* at ¶¶ 48–49.)

The IEP Team discussed revisions that could be made prior to the completion of the FBA. Many strategies were discussed, several of which Parents and H.L. rejected. (*Id.* at ¶¶ 40–42.) First, the IEP Team again discussed placing H.L. in a social skills class. (AD at ¶ 40.) Again, Parents voiced concerns that H.L. would pick up "bad social skills or shut down." (*Id.*) The social skills class was not included in the IEP. (*Id.*; Oct. 2018 Rev. IEP at 6.)

Second, the IEP Team discussed providing H.L. with a peer mentor "to help encourage appropriate socialization." (AD at ¶ 41.) H.L. said he did not want a peer mentor

because he did not want to appear different from the other students, (Doc. 13 at ¶ 54 (citing

N.T. vol. II at 455:13–18)), so no peer mentor was provided.  (AD at ¶ 41.)

Third, the IEP Team considered "having an adult assist [H.L.] each day at his locker

to ensure he is taking his homework home." (Oct. 2018 Rev. IEP  at 7.)  Parents wanted to

"hold off on this and see if the other SDI work." (*Id.*)

Fourth, in another attempt to increase his homework completion, the District had

previously suggested to Parents that H.L. be required to utilize the resource room during his

study halls.  (Oct. 2018 Rev. IEP at 4.)  At that point, "a few weeks" prior to the October 5

IEP Team meeting, Parents did not agree and "wanted to see if [H.L.] would do it on his

own." (*Id.*)  At the meeting, however, Parents agreed and it was decided H.L. would access

the resource room daily.  (*Id.*)

The IEP Team also discussed the format of H.L.'s detentions.  Because H.L. "did not

like after school detentions," Parents suggested he serve lunch detentions instead.  (AD at ¶

42.)  The IEP Team agreed to try lunch detentions, although they noted "reservations

regarding this as a consequence" because "lunch is a good time to promote appropriate

socialization with his peers." (Oct. 2018 Rev. IEP at 7.)

In addition, the IEP Team agreed to increase counseling sessions to one meeting

per week.  (AD at ¶ 43.)  They also decided to have one of H.L.'s teachers check in with him

in the morning and afternoon each day to "encourage a good day, homework completion,

and appropriate socialization." (Oct. 2018 Rev. IEP at 7.)  For this role, the Team purposely

chose a teacher with whom H.L. had a good relationship.  (*Id.*)  The Team agreed this teacher would check in with H.L. in a manner so that H.L. "would not realize this is a planned meeting in order to avoid [H.L.] becoming resistant."  (*Id.*)

Finally, the IEP Team discussed Parents' concern that "the teachers were not aware" of H.L.'s IEP.  (AD at ¶ 44.)  H.L.'s case manager explained that "all staff members are required to review IEPs," and that she "emailed staff with every IEP revision."[7]  (*Id.*) Moreover, "staff were required to view the revisions in the guidance office and sign that they viewed the document."  (*Id.*)  "The case manager also met with each teacher to explain the IEP."  (*Id.*)

After the October 5 meeting, the District requested Parents' consent to conduct an FBA, and Parents consented.  (Doc. 8-7, S-21; AD at ¶ 46.)

In early December 2018, Parents requested that H.L. "stop going to the resource room for assistance during study halls."  (AD at ¶ 47.)  The District accommodated their request.  (*Id.*)

By December 20, 2018, H.L. had accumulated twelve disciplinary referrals in the approximately four months since the beginning of the school year.  (Jan. 7, 2019 IEP, Doc. 8-7, S-31 ("Jan. 2019 IEP") at 13.)

**b. December 2018 RR and FBA**

---

[7] H.L.'s case manager was a special education teacher; both labels are used in the Administrative Decision.

On December 20, 2018, the District completed another Reevaluation Report ("December 2018 RR"), which incorporated the results of the FBA.  (AD at ¶¶ 48–49.)  The December 2018 RR incorporated input from the guidance counselor, principal, social worker, H.L.'s teachers, and Parents.  (AD at ¶ 50.)  The RR determined H.L. "remained eligible as a person with an OHI identification in need of [SDI]."  (AD at ¶ 51.)

The Intermediate Unit completed the FBA "using observational data collected over four different days."  (AD at ¶ 49.)  The FBA concluded that H.L. needed to "improve upon communication skills, the ability to complete tasks, the ability to self-regulate skills and improve social skills."  (Id.)  As a result, the FBA examiner recommended the IEP Team develop a PBSP for H.L., but included no recommendations regarding the content of such plan.  (Id.)

To guide the development of the PBSP and help determine which incentives would most effectively modify his behavior, the District had H.L. complete a survey about his likes and dislikes.  (AD at ¶ 52; Doc. 8-7, S-30.)  Parents also provided input.  (AD at ¶ 52.)  Teachers used the results of the survey "to alter reinforcements to see what worked best to have student participate and follow classroom procedure."  (Id.)

c. January 2019 IEP

The IEP Team convened again on January 7, 2019, to discuss the December 2018 RR, including the results of the FBA.  (AD at ¶ 53.)  H.L. attended part of the meeting but

"would not participate, instead showing an unwillingness to even be present by turning away from the group." (*Id.*)

The IEP Team discussed which strategies from the latest IEP were working and which were not. At this point, H.L. had been refusing to visit the resource room. (Doc. 13 at ¶ 65.) At the January 7 meeting, District staff attempted to encourage H.L. "to go and to keep the opportunity to attend the resource room in the IEP, but Parents instead wanted it removed from the IEP." (AD at ¶ 54.) The Team compromised and kept one visit per day during H.L.'s study hall. (*Id.*)

The IEP Team also discussed the social skills class again. This time, despite H.L.'s opposition to the idea, the Team agreed to require H.L. to start attending the class. (*Id.*; Doc. 13 at ¶ 66.)

H.L. also expressed that he did not want to take part in the daily check-ins with his teacher, but the Team agreed to continue them. (Jan. 2019 IEP at 14.) The January 2019 IEP provides for two daily check-ins. (*Id.* at 44.)

Next, the IEP Team developed a PBSP for H.L, to be implemented with the January 2019 IEP. The resulting IEP and PBSP set forth detailed "program modifications" and numerous new SDIs, strategies, and a behavioral goal. (*See id.* at 37–39.)

The PBSP provides District staff an approach for dealing with H.L.'s behavior. It includes "Antecedent (prevention) Strategies," explains the desired "Replacement Behavior," provides "Consequences (reinforcement) for when the student performs the

Replacement Behavior," and "Consequences (including procedures to follow) when the student performs the behavior of concern." (*Id.* at 38–39.) Some of the strategies listed are new, while some were employed as SDIs in previous IEPs. (*See id.*)

The new behavioral goal addresses H.L.'s behaviors more specifically. Instead of striving to "increase compliance in the school setting," the January 2019 IEP "PBSP Goal" challenges H.L. to "engage in compliant behaviors (following rules/directions) when given a demand/task and not make inappropriate verbal comments to avoid school tasks and gain attention." (Jan. 2019 IEP at 37.) Like the previous IEP, the goal aims to "reduce discipline referrals to zero as measured daily by teacher observation and recording of discipline referrals quarterly." (*Id.*) However, H.L.'s baseline performance reflects new measurements of H.L.'s current behaviors of concern: "baseline 29% inappropriate verbal comments, 54% non-compliant behaviors[,] [twelve] discipline referrals." (*Id.*)

The January 2019 IEP includes many SDIs resulting from the development of the PBSP. The Administrative Decision highlighted one of them: the use of a "safe pass." (AD at ¶ 57.) The safe pass allowed H.L. to visit "the guidance office or special education office to discuss any situation or to regroup before returning to class." (*Id.*) The PBSP also initiated the "use of a daily tracking chart of behavior with data to be used in instructional decision making," to be completed by H.L.'s teachers. (Jan. 2019 IEP at 46.) The results from the charts would determine whether H.L. earned a positive reinforcer. (AD at ¶ 71.) As positive reinforcement and based on H.L.'s survey results, the PBSP provided that he

19

could earn "time on his phone to play a game or listen to music" during his weekly visits with the social worker.  (*Id.* at 39.)

The January 2019 IEP increased H.L.'s visits with the social worker to six thirty-minute sessions per month, which was "the maximum amount of time allocated for social work services by the District."  (AD at ¶¶ 12, 58.)

Parents agreed to the new IEP, including the PBSP.  (AD at ¶ 59.)  H.L.'s mother signed the NOREP on January 17, 2019.  (*Id.*; Doc. 8-7, S-32.)

After the January 2019 IEP became effective, H.L.'s "case manager and others" met with H.L.'s teachers "to train them on the contents of the PBSP."  (AD at ¶ 60.)  The case manager shared the PBSP and explained its contents, as well as H.L.'s disabilities.  (*Id.*)  The case manager also explained how to complete the daily behavior tracking charts, and instructed the teachers to use them to record the SDIs that helped or did not help that day, and the steps taken to provide a structured environment for H.L.  (*Id.* at ¶¶ 60, 61.)

The implementation of the January 2019 IEP and PBSP proved difficult.  H.L. generally "continued to struggle with organization particularly in classes where he was experiencing difficulty."  (AD at ¶ 68.)  He "required prompting from Parents in order to complete work."  (*Id.*)  Ultimately, he "missed a significant amount of instruction due to behavioral dysregulation."  (*Id.*)

The case manager monitored H.L.'s progress in part by reviewing the completed daily charts.  (*Id.* at ¶ 72.)  If certain SDIs "were not working for a teacher to curtail [H.L.]'s

behaviors, she would meet with the teacher and develop other ideas." (*Id.*)  She sent the completed charts to Parents each week.  (*Id.* at ¶ 71.)

H.L. declined to take advantage of several of his IEP provisions.  For example, his IEP permitted him to take exams in an alternate location to improve his focus, but he refused teachers' suggestions that he do so.  (Doc. 13 at 82 (citing N.T. vol. II at 364:5–8).)  H.L. also declined to review his academic work with his special education teacher.  (*Id.* (citing N.T. vol. II at 365:3–8).)

H.L. also continued to resist visiting the resource room—the January 2019 IEP's reduction to one visit per day did not improve his attitude nor his behavior there.  (Doc. 13 at ¶ 77.)  Still, H.L.'s special education teacher encouraged him to visit and to complete his work there.  (AD at ¶¶ 77, 78.)  He went occasionally, but he either declined to bring school work with him or was unwilling to do it.  (*Id.*)  H.L. would tell his special education teacher "that he preferred to be in study hall, rather than the resource room, so he could use his phone to talk to his friends."  (Doc. 13 at ¶ 79. (citing N.T. vol. II at 312:20–25).)

The use of H.L.'s phone privileges as positive reinforcement also proved problematic.  The Special Education Director testified that "the phone had become a point of disruption . . . there were times that it could be used as a reinforcer, but most of the time [H.L.] was using it at the wrong time and so he lost his phone privilege."  (Doc. 13 at ¶ 80 (quoting N.T. vol. II at 471:9–14).)  Further complicating the issue, "Parents sometimes wanted phone privileges[] incorporated into the PBSP as a consequence, other times not."

(AD at ¶ 70.)  For example, H.L.'s mother called the District on March 27, 2019, asking that H.L.'s phone privileges be reinstated.  (*See id.*)[8]

H.L. used the safe pass on occasion, but "no specific data was collected regarding the antecedents, [H.L.]'s behaviors or the consequences leading up to the use of the [safe pass]."  (AD at ¶ 66.)  H.L. would use the safe pass to visit with the learning support teacher, who kept candy in her room for him.  (*Id.* at ¶ 63.)  Often, H.L. would "enter the room and sit head down."  (*Id.*)  When District staff would remind H.L. about the option to use his safe pass, he "almost always . . . refused to consistently use the pass."  (*Id.* at ¶ 64.)  H.L. told the counselor the pass was "stupid" and did not want to use it.  (*Id.*)  "To work-around [H.L.]'s dislike for the [safe pass], the counselor would use different terminology to see [H.L.]"  (*Id.*)

At some point, Parents "came to believe [H.L.]'s life science teacher was not implementing the PBSP."  (AD at ¶ 73.)  This coincided with H.L.'s "particularly challenging" behavior in his science class.  (Doc. 13 at ¶ 83.)  H.L. would "complain to his counselor, and others, about the science teacher, calling her 'weird' and 'nuts' and accusing her of using drugs."  (*Id.* (citing N.T. vol. I at 236:4–14).)

Upon learning of Parents' concern, the case manager met with H.L.'s science teacher "to discuss the antecedents she used and what she could try to implement the

---

[8] The Administrative Decision states that "phone privileges was in [H.L.]'s PBSP as a consequence."  (AD at ¶ 70.)  The Court's reading of the January 2019 IEP does not comport with this finding.  The January 2019 IEP does not list the revocation of phone privileges as a consequence, but it does include phone time as positive reinforcement.  (Jan. 2019 IEP at 39.)

PBSP." (AD at ¶ 74.)  The teacher "was not resistant to implementing the PBSP; instead, she continued to try new things to curtail [H.L.]'s behaviors." (*Id.* at ¶ 75.)  District staff "would tell [Parents] what [H.L.]'s life science teacher would try and requested suggestions from Parents, however the Parents did not give any further definite input." (*Id.* at ¶ 76.)

H.L.'s behavior declined as seventh grade went on.  "[T]here was a steady increase [in] the frequency, severity and intensity of the behavioral incidents of [H.L.]'s cursing and inappropriate behaviors in the classroom." (AD at ¶ 69.)  H.L.'s teachers stopped requiring H.L. to follow through on the SDI because doing so would cause him to "shut down" or "become more of a distraction in the classroom." (*Id.* at ¶ 79.)  Over time, H.L. began refusing to check in with the case manager. (*Id.* at ¶ 80.)  "By April [2019], when [he] saw the case manager at the end of the day, [he] would either ignore her, name call or walk away from her." (*Id.*)

Following a "meltdown" at home in April that resulted in a call to the police, Parents admitted H.L. to an inpatient behavioral health program for an evaluation. (*Id.* at ¶ 81; Doc. 13 at ¶ 87 (citing S-34).)  H.L. was inpatient from April 8, 2019, to April 19, 2019. (*Id.*)  A psychiatric evaluation indicated diagnoses of Disruptive Mood Dysregulation Disorder ("DMDD") and ADHD, Combined Type. (*Id.*)

After his hospitalization and upon his return to school, H.L.'s emotional and behavioral issues continued. (AD at ¶ 82.)  Parents requested that H.L. be excused from the detentions and suspensions he had incurred before his hospitalization. (*Id.*)  H.L.'s

principal denied their request, and H.L. was required to serve his detentions and suspensions. (*Id.*)

At this point, having "receive[d] the information from the behavioral health inpatient treatment and based on Parents' concerns about discipline," the District attempted to hold an IEP Team meeting. (*Id.* at ¶ 83.) A meeting was scheduled for May 30, 2019, but it was never held. (*Id.*) Before the scheduled meeting, Parents requested an Independent Educational Evaluation (IEE) for H.L. at the District's expense. (*Id.* at ¶ 84.) The District agreed to fund an IEE. (*Id.*)

The IEE was conducted by Dr. Douglas Della Toffalo over the course of May through September 2019, when he completed his report. (Confidential IEE Report, AD at ¶ 96; Doc. 8-8, S-40 ("IEE Report").) The report is discussed *infra*.

### 4. 2019–20 School Year: Eighth Grade

When H.L. started eighth grade, the building principal changed, and the District shifted its approach to focus on "restorative practices." (AD at ¶ 86.) The District implemented a "districtwide initiative to implement a positive type behavior plan and to encourage teacher/student relationships positively and decrease discipline issues." (N.T. vol. II at 395:10–19; AD at ¶ 87.)

At the very start of the year, H.L. had "no ongoing behavioral issues." (AD at ¶ 85.) He still resisted his daily check-ins with his case manager; on August 28, 2019, H.L. personally emailed his case manager stating that he was "not doing the check[-]ins

anymore." (Doc. 8-8, S-39 at 1.)  She would still find him to check in each day.  (AD at ¶ 85.)

H.L.'s case manager also developed a "computerized on-task behavior tracking and charting protocol" to build upon the daily behavioral charts implemented the previous year. (*Id.*)  This allowed each of H.L.'s nine teachers to enter a note about his behavior every day, providing the principal and case manager with real-time information and enabling them to foresee or address any issues quickly.  (Doc. 13 at ¶ 93.)  His case manager also "kept notes on H.L.'s preferences as to how he wished to interact with her, to maximize her rapport with him."  (*Id.* at ¶ 94 (citing N.T. vol. II at 422:21–25).)

Soon enough, H.L.'s behavior worsened, notwithstanding the new principal and the new "restorative" approach.  (AD at ¶ 92.)  H.L. began to display particularly disruptive and non-compliant behaviors in his English class.  (*Id.* at ¶ 88.)  He was "walking in front of the teacher during PowerPoint presentations; making noise, touching other students; getting into arguments with the teacher; [and displaying] non-compliant avoidance, which usually started when he was held responsible for work and quizzes that he did not want to do."  (*Id.*) H.L. had also made comments "about 'getting even' with [his English teacher] by disrupting the class or doing things to annoy her."  (*Id.* at ¶ 89.)

### a. September 2019 IEP Revisions

The IEP Team convened a meeting via phone to discuss H.L.'s behavior on September 9, 2019.  (*Id.* at ¶ 89.)  The meeting resulted in a revision to the January 2019

IEP.  (Sept. 2019 Rev. IEP, Doc. 8-8, S-44 ("Sept. 2019 Rev. IEP") at 3.)  The Team agreed

to "a trial placement in the learning support classroom with the then-current case manager

to ensure [H.L.] was receiving English instruction."  (AD at ¶ 89.)

About a week later on September 20, 2019, the IEP Team met again.  (Id.)  The

Team agreed to make the change to H.L.'s English class permanent and agreed to change

his Reading class instruction as well.  (*Id.*)  While using a safe pass, H.L. had told the

guidance and special education teachers that he "[could not] handle being in" his current

Reading class and sought to receive his Reading instruction in the learning support

classroom instead.  (Sept. 2019 Rev. IEP at 3.)  The IEP Team, including Parents, agreed

to make this change.  (*Id.*)

The IEP Team also revisited H.L.'s behavioral goal, in light of the District's shift

toward "restorative practices."  (*Id.*)  Because discipline referrals were not "being utilized as

much" under the new administration, the Team agreed that H.L.'s goal to "reduce discipline

referrals" was no longer appropriate.  (*Id.*)  Accordingly, the Team revised his existing goal,

creating two new goals:

> *Task Completion Goal:* Given clear expectations of school and classroom rules
> and taught self-regulation strategies, [H.L.] will engage in compliant behaviors
> (following rules/directions) when given a demand/task by completing classwork
> 100% of the time increasing his baseline average of 64% to 100% as measured
> via daily teacher observation and recording of work completion.
>
> *Behavior Goal:* Given clear expectations of school and classroom rules and
> taught self-regulation strategies, [H.L.] will not make inappropriate verbal
> comments/cursing to avoid school tasks and gain attention thus decreasing his
> current usage of inappropriate verbal comments/cursing in class to 0% of the

time as measured via daily teacher observation.  (Current baseline indicates in
13% of his classes he is cursing/making inappropriate comments.)

(*Id.*)  The Team updated H.L.'s IEP accordingly.

Over time, H.L. "became more dysregulated, disrespectful and disobedient to the

case manager" during his English class in the learning support classroom.  (AD at ¶ 90.)  He

would curse at the teacher and refuse to do his work, and would text or play games on his

phone during class.  (*Id.*)

### b. September 2019 IEE

Dr. Della Toffalo completed his IEE report on September 21, 2019.  (*See* IEE

Report.)  The IEE Report consisted of results from various clinical tests,[9] an FBA, a

comprehensive review of the District's and Parents' then-existing records, an interview of

Parents, and in-school observation of H.L.  (AD at ¶ 97; IEE Report.)

As the IEE Report explains, the testing portion of Dr. Della Toffalo's evaluation was

scheduled to be completed on July 9, 2019.  (IEE Report at 5.)  Dr. Della Toffalo had to

discontinue the testing because H.L. "fell asleep at several points throughout the

evaluation."  (*Id.*)  H.L. told the doctor that he had not fallen asleep until 7:30 AM and that he

"normally" goes to bed at "5 or 6 AM" because he stays up texting or talking with his

---

[9] These included a Woodcock-Johnson Fourth Edition Test of Cognitive Abilities, a Woodcock-Johnson Fourth Edition Test of Achievement, a Dean-Woodcock Neuropsychological Battery, a Conners' Continuous Performance Test (second edition), a Delis-Kaplan Executive Function System, a Beery Buktenica Developmental Test of Visual-Motor Integration (sixth edition), a Behavior Assessment System for Children (third edition), and a Behavior Rating Inventory of Executive Function (second edition).  (IEE Report at 1.)

friends.[10]  (*Id.*)  Dr. Della Toffalo continued the testing the next day.  (*Id.*)  On July 10, H.L. was more well-rested but was not allowed to have his cellphone in his possession "to minimize interruptions and distractibility."  (*Id.*)

Dr. Della Toffalo notes that H.L.'s Woodcock-Johnson Fourth Edition Test of Cognitive Abilities results suggest his "overall intellectual functioning was in the upper end of the 'below average' range."  (AD at ¶ 18.)  His "General Intellectual Ability" fell into the "Well Below Average" range; his "overall composite" score was "Below Average"; his "Comprehensive Knowledge" was "Average"; his "Fluid Reasoning and Cognitive Process Speed" was "Below Average"; and his "Cognitive Efficiency and Short-Term Working Memory" was "Well Below Average."  (*Id.* at ¶ 100.)  In addition, "[v]arious subtests . . . in reading, math, and writing indicated 'Average' to 'Below Average' performance."  (*Id.* at ¶ 101.)

The IEE Report also includes Parents' and teachers' ratings of H.L.'s executive functioning, attention, language, motor skills and sensory-perceptual skills.  (IEE Report at 8–16.)  Parents' and teachers' scores were "remarkably consistent."  (AD at ¶ 102.)  "The ratings indicate that sustained attention, impulse inhibition, cognitive efficiency, tendency to underestimate and/or under allocate the amount of mental effort required to complete tasks."  (*Id.*)  Their ratings yielded "scores in the 'Clinically Significant' range for acting out,

---

[10] He indicated that he generally falls asleep at midnight during the school year, but that he also takes naps during the classes he does not like.  (*Id.*)

aggression and conduct problems." (*Id.* at ¶ 103.) "In stark contrast" are H.L.'s self-ratings, which "indicate that he perceives himself as experiencing/exhibiting no 'clinically significant' range level of difficulty with any areas of executive functioning." (IEE Report at 13.) H.L. did self-rate his emotional control in the "at-risk" range." (*Id.*)

Finally, the IEE Report summarizes Dr. Della Toffalo's in-school observations of H.L. He observed H.L. "on May 28, 2019 in several different environments over the course of the majority of a full school day." (IEE Report at 21.) The IEE Report provides detailed descriptions of H.L.'s behaviors throughout the day, and the Administrative Decision highlights some of the doctor's observations. First, Dr. Della Toffalo observed teachers frequently redirecting H.L. after he exhibited behaviors of concern. (AD at ¶ 104.) He observed that "teachers were properly 'picking their battles' with [H.L.], especially with low-level behaviors, to [avoid] triggering more significant behaviors and to maintain control of the classroom." (*Id.* at ¶ 105.) Dr. Della Toffalo noted that on the single observation day, H.L "was not written up once, yet he could easily have been 'written up' well in excess of 20 different times for many different inappropriate behaviors throughout the day." (IEE Report at 25.) Dr. Della Toffalo also observed that when H.L. refused to leave the classroom to take a break, teachers had limited options for consequences other than ignoring his behavior. (AD at ¶ 106.)

Dr. Della Toffalo determined that "at times [H.L.]'s dysregulation was done willingly and knowingly to acquire a desired outcome." (*Id.* at ¶ 107.) He noted further that "the

existing PBSP consequences have little to no meaning" to H.L. (*Id.* at ¶ 108.)  Finally, Dr.

Della Toffalo concluded,

> Due to a variety of factors (the most prominent of which appears likely to be historical disagreement between [H.L.]'s parents and the school over appropriate consequences for inappropriate behaviors), [H.L.] now appears to have the perspective that he can choose to do (or not do) whatever he wants, whenever he wants, and there are not likely to be undesirable consequences for his inappropriate behaviors or lack of compliance with adult directives.

(IEE Report at 26.)

Overall, the IEE Report "yielded results consistent with a significant number of

behaviors [and] characteristics related to ADHD[] and DMDD." (*Id.* at ¶ 109.)  Dr. Della

Toffalo recommended "a variety of SDIs, all of which in [his] opinion should be provided in a

full-time behavioral/emotional support classroom with clear consequences." (*Id.*)  The

doctor also "strongly recommended" "a family-based approach to community-based mental

health treatment . . . due to the nature, frequency, and severity" of H.L.'s behaviors.  (IEE

Report at 28.)  At the Hearing, Dr. Della Toffalo explained his "belief that there needed to be

a supplement to efforts the [District] was making.  There needed to be something

supplementing that in the home environment."  (Doc. 13 at ¶ 108 (quoting N.T. vol. I at

185:15–20).)

### c. October 2019 IEP Revision

The IEP Team convened a meeting on October 1, 2019, following receipt of the

completed IEE Report.  (*See* AD at ¶ 107.)  Dr. Della Toffalo participated and told the IEP

Team that H.L. "needed a highly structured educational placement designed to address

attention deficits, executive functioning deficits, noncompliance, and dysregulation behaviors throughout the school day."  (*Id.* at 110.)  The IEP Team, including Parents, agreed.  (*Id.*)

Parents requested, and the District agreed, to place H.L. at a particular private school facility that "had an outdoor component which can motivate [H.L.] to follow rules, and there was [sic] immediate behavior modifications built into the program [via] a point system." (*Id.* at ¶ 111.)

### d. Private School Placement

H.L. left the District and enrolled at Yellow Breeches Educational Center (YBEC) in October 2019.  (AD at ¶ 112; Doc. 13 at ¶ 111.)  YBEC is a private academic school licensed by the Commonwealth of Pennsylvania.  (AD at ¶ 112.)  YBEC uses "an experiential education model that encourages hands-on learning in the classroom and interactive experiences outside of the classroom," and its curriculum "includes an adventure program."  (*Id.*)

The IEP Team, including representatives from both YBEC and the District, met in December 2019.  (*Id.* at ¶ 113; Dec. 2019 YBEC IEP, Doc. 8-8, S-50.)  At this meeting, Parents raised concerns specifically about H.L.'s math class.  (AD at ¶ 113.)  A YBEC representative told Parents the school follows state standards for math "as if [H.L.] was in the District."  (*Id.* at ¶ 115.)  Parents also expressed that H.L.'s homework overall is too

basic, highlighting his English homework involving writing in cursive. (*Id.*) Parents believe H.L.'s homework at YBEC "resembles work previously completed in third grade." (*Id.*)

The YBEC IEP notes that H.L.'s math progress was monitored through bi-weekly Common Core State Standards assessments. (*Id.* at ¶ 116; Dec. 2019 YBEC IEP at 4.) Over his first eight weeks at YBEC, H.L.'s math assessment scores ranged from 33% to 43%. (*Id.*) Despite these scores, the IEP Team decided H.L. did not require a math goal in his IEP. (*Id.*)

H.L. had also taken four language arts assessments, and his scores were higher but varied. In reading fluency and comprehension, H.L. scored between 60% and 76%. (*Id.* at ¶ 117.) In writing, H.L.'s scores ranged from 85% to 90%. (*Id.*) The IEP Team decided H.L. did not require an English and language arts goal, either. (*Id.*)

H.L.'s behavioral goal remained substantively the same, but his progress toward the goal would be measured using "daily point sheets." (Dec. 2019 YBEC IEP at 17.)

At the Hearing, Dr. Della Toffalo and Parents agreed that H.L. requires a "comprehensive curriculum-based assessment in [m]ath and in English and [l]anguage [a]rts" to identify any "holes" in his education. (*Id.* at ¶ 114; N.T. vol. I at 168:20–170:1.)

### B. Administrative Decision

Upon consideration of the Record and the Hearing testimony, ALJ Jelley denied Plaintiffs' claims in their entirety, finding Plaintiffs failed to prove the District denied H.L. a FAPE with respect to any of the three years alleged. ALJ Jelley noted initially that he "found

all of the witnesses who testified to be credible," and that the testimony of the District staff was "particularly persuasive." (AD at 23.) He noted further that while he found Parents' testimony credible, their testimony "lacked [a] sufficient supporting factual basis to advance the individual claims."[11] (Id.)

On the merits, ALJ Jelley concluded that H.L. had received a FAPE. He considered all of the District's efforts, responses, and adjustments to H.L.'s behaviors over time. ALJ Jelley concluded that H.L.'s "initial evaluation, identification and offer of a FAPE were all completed in a timely fashion." (Id. at 26.) With respect to the 2017–18 school year, ALJ Jelley noted that the May 2018 Reevaluation was "comprehensive." (Id. at 27.) Considering the "context of the then-current circumstances," the subsequent June 2018 IEP included an "appropriate" and "ambitious" behavioral goal, and "ambitious" SDIs. (Id.)

ALJ Jelley considered the efforts taken by the District at the start of the 2018–19 school year. He considered the IEP Team's October meeting to review H.L.'s performance during the first few weeks of the year, the District's offer to provide H.L. access to the resource room, which Parents declined, the District's completion of an FBA evaluation, and

---

[11] ALJ Jelley specified,

For example, while the Parents believe the teachers did not implement the IEP and/or the PBSP, that underlying belief was not corroborated by the record. Likewise, while the Parents believe the school work during the day and the homework from the agreed-on private placement are insufficient, the Parents did not produce any homework sheets or call a witness from the placement to corroborate their personal beliefs.

(AD at 23 (footnote omitted).)

H.L.'s twelve disciplinary referrals from November 5, 2018, through December 11, 2018. (*Id.*) ALJ Jelley also considered the January 7, 2019 IEP Team meeting; the revised goal statement, additional SDIs focused on "positive reinforcement, social skills, self-regulation and organizational strategies," and additional social work support in the January 2019 IEP; and Parents' agreement to the final IEPs in all cases. (*Id.* at 28.) ALJ Jelley concluded that the goals were measurable and the SDIs "supported [H.L.]'s changing circumstances identified in the FBA." (*Id.*)

With respect to H.L.'s placement at YBEC during the 2019–20 school year, ALJ Jelley concluded that based on the "limited record," he lacked sufficient facts to determine if the YBEC academic program was "otherwise inappropriate." (*Id.* at 30.) "Absent preponderant proof" that H.L. was denied a FAPE at YBEC, ALJ Jelley denied Plaintiffs' claim.

Overall, ALJ Jelley concluded that H.L.'s "evaluations were performed in a timely fashion," "all staff implemented the program as designed, and the "IEP and placement were reasonably calculated to yield meaningful progress." (*Id.* at 28, 30.) Accordingly, he ruled in favor of the District. (*Id.* at 30.)

## IV. ANALYSIS

Each party seeks judgment on the administrative record alone. Plaintiffs argue they are entitled to judgment because ALJ Jelley erred by applying a "good faith" standard to determine whether the District had provided a FAPE, and if ALJ Jelley had applied the

proper standard, the facts of record support a finding in their favor. (Pls. Br. in Support, Doc. 12-2 at 5.) The District argues that ALJ Jelley applied the correct legal standard, his findings of fact are supported by the Record, and no basis exists to disturb his decision. (Defs. Br. in Support and Opp., Doc. 14 at 4.) As the party challenging the administrative decision, Plaintiffs bear the burden of persuasion. *See Ridley Sch. Dist.*, 680 F.3d at 270.

### A. Legal Framework

Congress enacted the IDEA to "increase the personal independence and enhance the productive capacities of handicapped citizens." *Kruelle v. New Castle Cnty. Sch. Dist.*, 642 F.2d 687, 691 (3d Cir. 1981). In its most general terms, the statute seeks "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

A FAPE must be "tailored to the unique needs" of a child with a disability by means of an IEP. *Rowley*, 458 U.S. at 206 (citing 20 U.S.C. § 1401(18)). "The IEP is . . . the 'primary mechanism' for delivering a FAPE." *Ridley*, 680 F.3d at 269 (quoting *W.B. v. Matula*, 67 F.3d 484, 492 (3d Cir. 1995)). "Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of special services that the school will provide." *Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (citing 20 U.S.C. § 1414(d)(1)(A)).

Under the IDEA, a school is not required to "maximize the potential of handicapped children." *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000) (internal quotations omitted). Rather, to be compliant under the IDEA, "a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex. Rel. Joseph F. v. Douglas Cnty. Sch. Dist.*, 580 U.S. 386, 399 (2017). "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* at 999 (emphasis in original). "This standard is markedly more demanding than the 'merely more than *de minimis* test' . . . . It cannot be the case that the Act typically aims for grade-level advancement for children with disabilities who can be educated in the regular classroom, but is satisfied with barely more than *de minimis* progress for those who cannot." *Endrew*, 580 U.S. at 402.

The Third Circuit's formulation of a school district's obligation, similar to *Endrew*, requires that "the educational program '. . . be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential and individual abilities.'" *K.D. v. Downingtown Area Sch. Dist. (In re K.D.)*, 904 F.3d 248, 254 (3d Cir. 2018) (quoting *Ridley Sch. Dist.*, 680 F.3d at 269). Put differently, the Third Circuit's test "requires an educational program 'likely to produce progress, not regression or

trivial educational advancement.'" *K.D.*, 904 F.3d at 254 (quoting *Ridley Sch. Dist.*, 680

F.3d at 269).[12]

Nonetheless, for a student who is not integrated into the regular classroom, the

Supreme Court has noted,

> his IEP need not aim for grade-level advancement. But his educational program
> must be appropriately ambitious in light of his circumstances just as
> advancement from grade to grade is appropriately ambitious for most children
> in the regular classroom. The goals may differ, but every child should have the
> chance to meet challenging objectives.

*Endrew*, 580 U.S. at 402.

It follows that an IEP "must address any behavioral issues that prevent a child from

obtaining any meaningful benefit from the education provided." *Northfield City Bd. of Educ.*

*v. K.S.*, No. CV 19-9582 (RBK/KMW), 2020 WL 2899258, at *11 (D.N.J. June 3, 2020)

(citing *New Milford Bd. of Educ. v. C.R.*, 431 F. App'x 157, 160 (3d Cir. 2011)), *aff'd*, 847 F.

App'x 130 (3d Cir. 2021); *see also Lauren P. ex rel. David and Annmarie P. v. Wissahickon*

*Sch. Dist.*, 310 F. App'x 552, 554 (3d Cir. 2009)).

Again, the critical point is that "the IEP *must aim* to enable the child to make

progress." *Endrew*, 580 U.S. at 399.  Courts "may not rely on hindsight to second-guess an

educational program that was reasonable at the time." *K.D.*, 904 F.3d at 255.  Nor may

courts "substitute their own notions of sound education policy for those of the educational

---

[12] The Third Circuit confirmed in *K.D.* that its precedent is consistent with the standard set forth by
the Supreme Court in *Endrew*. *K.D.*, 904 F.3d at 254.

agencies they review." *Moynihan v. W. Chester Area Sch. Dist.*, No. CV 19-0648, 2022 WL

837182, at *4 (E.D. Pa. Mar. 18, 2022) (quoting *Susan N.*, 70 F.3d at 757).

## B. Discussion

### 1. ALJ Jelley's Application of IDEA Standard

Plaintiffs' first argument fails because ALJ Jelley applied the correct legal standard to

determine whether the District provided H.L. a FAPE.  Plaintiffs argue that ALJ Jelley erred

by applying a subjective "good faith" standard, not the *Endrew* standard, in ruling against

them.  They point to two lines in the Administrative Decision where ALJ Jelley described the

District's "good faith effort" to meet H.L.'s needs.  (*See* Doc. 12-2 at 7.)  First, they cite the

language at the end of the following passage:

> Based on the then-existing data, including the disciplinary referrals, the PBSP
> baseline data and the SDIs, I now find the District offered the Student a FAPE.
> The present levels and the goal were measurable. The SDIs supported the
> Student's changing circumstances identified in the FBA. The increase in social
> worker support was a significant commitment of resources. When these
> individual components are viewed as a whole, based on the then-existing data,
> I now find the IEP and placement were reasonably calculated to yield
> meaningful progress. I also find the record is preponderant that during all times
> relevant any changes to the IEP, the SDIs, including the increase in social work
> services and the PBSP, were regularly communicated to the staff. Accordingly,
> *I now find the District made a good faith effort to provide a FAPE*; therefore, I
> now find the Parents failed to meet their burden of proof regarding the denial
> of a FAPE.

(AD at 28 (emphasis added).)  Second, Plaintiffs cite ALJ Jelley's summary concluding his

decision:

> At all times relevant, *the District made a good faith effort* to adjust the Student's
> IEPs to the then existing circumstances and needs. The evaluations were

performed in a timely fashion and the IEPs were otherwise appropriate. The record, when viewed as a whole, is preponderant that at all times relevant, all staff implemented the program as designed. Accordingly, for all of the above reasons, I now find in favor of the District and against the Parents.

(*Id.* at 30 (emphasis added).)   Pointing to these lines, Plaintiffs contend that while "the District's efforts may have been done in 'good faith', it does not comport with the requirements set forth by the Supreme Court under a *Rowley/Endrew* standard." (Doc. 12-2 at 8.)

To the contrary, ALJ Jelley applied the correct standard, and his acknowledgment of the District's "good faith" efforts does not render the rest of his application erroneous.  The Administrative Decision plainly states the standards set forth by the Supreme Court in *Rowley* and *Endrew*, as well as relevant Third Circuit precedent.  (*See* AD at 24–25 (first citing *Rowley*, 458 U.S. at 176; then citing *Endrew*, 580 U.S. at 386; then citing *Ridgewood Board of Education v. N.E.*, 172 F.3d 238, 247 (3d Cir. 1999); and then citing *K.D.*, 904 F.3d at 248).)

And ALJ Jelley's application does not stray from these standards.  For example, he notes that under *Endrew*, "an IEP 'is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth.'"  (AD at 25 (citing *Endrew*, 580 U.S. at 400).)  He then explains when and how the District took H.L.'s circumstances into consideration, time and time again, by measuring baseline data, collecting input from teachers, conducting evaluations, and tracking disciplinary referrals. (AD at 26–27.)  He acknowledges that crafting an IEP "reasonably calculated" to enable progress "requires a prospective judgment by school officials." (*Endrew*, 580 U.S. at 399;

AD at 25.) He then notes the IEPs, though repeatedly revised, were "based on the then-existing data." (AD at 28.) Further, he concludes that the behavioral goal was "measurable," the "SDIs supported [H.L.]'s changing circumstances identified in the FBA," and the IEP and placement were "reasonably calculated to yield meaningful progress." (AD at 28.) ALJ Jelley accordingly applied the correct standard.

### 2. FAPE

Plaintiffs contend that under the *Rowley* and *Endrew* standards, the Record supports a finding that the District denied H.L. a FAPE. Having determined that ALJ Jelley in fact applied the correct standard, the question is whether the Record ultimately supports his decision in favor of the District. Plaintiffs argue it does not, because (1) "the District failed to adequately assess and address [H.L.]'s behaviors"; (2) "the Hearing Officer erred in finding that the only behavioral goal, which was repeated on a yearly basis and solely measured the number of disciplinary referrals, was appropriate"; and (3) ALJ Jelley "ignore[d] District staff admissions regarding the lack of progress of [H.L.] and insufficiency of the District's plan."[13] (Doc. 12-2 at 9.) Applying a "modified de novo review" and giving "due weight" to

---

[13] Plaintiffs also argue Defendant improperly attempted to shift the blame to Parents for their failure to provide a FAPE, and that "the attitude of the Defendant filtered into the findings of the Hearing Officer." (Pls. Rep. Br., Doc. 15 at 14.) While it is certainly the District's obligation to provide a FAPE, the Court considers evidence of strategies that the District offered and Parents rejected because they "reflect[] the steps the [District] took, and services offered in the IEPs, in an effort to help [H.L.] make progress." *See K.D. v. Downingtown Area Sch. Dist.*, No. CV 16-0165, 2017 WL 3838653, at *9 n.8 (E.D. Pa. Sept. 1, 2017), *aff'd*, 904 F.3d 248 (3d Cir. 2018).

ALJ Jelley's findings, *S.H.*, 336 F.3d at 270, the Court concludes that the Record supports his decision with respect to each of the three academic years.

In brief, the Record demonstrates that H.L.'s behaviors worsened over time despite the District's efforts, and by the time the IEE was conducted in the summer and fall of 2019, the situation was dire. But it was not always that way, and the Record indicates that the District again and again made reasonable decisions with respect to H.L.'s education based on his ever-changing circumstances as they were at the time, and commensurate with the severity of his behavioral issues. And in fact, Parents repeatedly signed off on those decisions. In essence, Plaintiffs ask this Court to reverse the Administrative Decision because the IEPs may not have been ideal, only reasonable, *Endrew,* 580 U.S. at 399, and to "rely on hindsight to second-guess an educational program that was reasonable at the time," neither of which the Court will do. *K.D.*, 904 F.3d at 255.

### *i. Whether District Adequately Assessed and Addressed H.L.'s Behaviors*

During the relevant time period, the District sufficiently assessed and reassessed, and addressed and readdressed H.L.'s behaviors. First, the Record supports ALJ Jelley's finding that the District provided a FAPE during H.L.'s sixth grade year, because the District adequately assessed his needs, created two IEPs "reasonably calculated" to enable him to make progress appropriate in light of his then-current circumstances, and reconstructed his IEP as soon as it proved necessary.

H.L.'s September 2017 IEP, as with those that would follow, reflects the input of his regular education teachers, special education teachers, the Director of Special Education, social workers, and Parents.  (Sept. 2017 IEP at 3.)  It includes "an assessment of [H.L.]'s current educational performance," *Schaffer*, 546 U.S. at 53 (citing 20 U.S.C. § 1414(d)(1)(A)), including behavioral performance, in the form of teachers' substantive comments and ratings.  (Sept. 2017 IEP at 3.)  H.L. did not receive a single "poor" rating from any of his teachers for any of the sixteen behavioral categories.  (*Id.* at 9.)  And teachers' substantive comments are overwhelmingly positive; H.L.'s regular education classroom teacher notes that he is "compliant with school and classroom rules," he is "not argumentative," and "there have been no power struggles.  (*Id.* at 13.)  In addition to his positive ratings from teachers, H.L. had received zero disciplinary referrals that year or the year prior.  (*Id.* at 12.)

With all of this in mind, the IEP Team reasonably agreed to discontinue H.L.'s previously-implemented "individualized behavior plan," but did not ignore his behavior. (Sept. 2017 IEP at 15.)  They implemented SDIs that were appropriately aimed at reinforcing appropriate classroom behavior and encouraging compliance with teachers' rules and directions.  *See supra* note 4.  They provided him with resources such as social skills services, an aide, and twice-monthly itinerant learning support services.  (AD at ¶¶ 10, 11.)  And they created a "maintenance" behavioral goal to "remain compliant in the school setting" and keep discipline referrals at zero—with no significant behavioral concerns to

date, such a goal was "reasonably calculated" to enable [H.L.] to make progress appropriate in light of [his] circumstances." (Sept. 2017 IEP at 12); *Endrew*, 580 U.S. at 399. At that point, the IEP Team concluded, reasonably, that H.L.'s "circumstances" did not include any behaviors that would prevent him from "obtaining any meaningful benefit from the education provided." *Northfield City Bd. of Educ.*, 2020 WL 2899258, at *11.

At the end of sixth grade, the District reassessed H.L.'s performance and found that while he was performing "at or close to grade-level" in all of his academic subjects, he was exhibiting "ongoing behavioral and self-regulation difficulties." (AD at ¶ 18.) He had incurred one disciplinary referral in the third marking period, and several in the last marking period. (*Id.* at ¶ 35.) Teacher and social worker comments in the May 2018 RR shed light on his challenges: difficulties with anger management, emotional control, oppositional, defiant and disrespectful attitudes, distraction, and poor organizational skills. (*Id.* at ¶ 34.)[14]

Almost immediately, the District addressed these developments. Not two weeks later, a new IEP was developed. While the Team—including Parents—agreed that H.L.'s

---

[14] Plaintiffs argue ALJ Jelley's findings of fact are "inconsistent[]" because he "touts [H.L.]'s alleged progress in his behavioral goals because of the reduction in disciplinary referrals" and goes on to "cite at length the behavioral concerns listed by [H.L.]'s teachers" in the May 2018 RR. (Doc. 12-2 at 11.) But this is not so. In fact, ALJ Jelley noted that H.L. started the year with no discipline referrals, and then accurately described the issues of Record that arose later in the year. (AD at ¶¶ 9, 18.) By ignoring the passage of time, Plaintiffs ignore a crucial aspect of the FAPE standard: that it is time-sensitive, and the reasonableness of a District's actions depend on the current circumstances and not on hindsight. *Isabelle K. v. Manheim Twp. Sch. Dist.*, No. 5:19-CV-05517-KSM, 2022 WL 226488, at *14 (E.D. Pa. Jan. 26, 2022) ("[T]he Third Circuit has admonished time and again that IEPs are to be assessed 'as of the time they are offered to the student, *not from some later date.*'") (quoting *Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1993)).

behavioral issues were "isolated" and "did not impede his or others' learning" and therefore

a PBSP was unnecessary, they still apparently recognized the downward trend and

implemented new strategies to address his behavior.  (AD at ¶ 29.)  They looked specifically

at what they believed was triggering his noncompliant behaviors and considered strategies

that would address those triggers.  For example, the Team viewed his behaviors as

"generally isolated to the bus," so they added an SDI to decrease time spent on the bus,

and the District shortened his bus route.  (June 2018 IEP at 29.)  Notably, Parents rejected

the District's offer to provide a van, which may have further limited opportunities for poor

behavior.  At the same time, the Team's decision was "reasonably calculated to enable

[H.L.] to make progress in light of [his] circumstances" because they considered his

preferences, which contributed to his overall attitude towards school.  The Court similarly

considers other offers the District made and Parents declined—"access to the resource

room for tests, homework completion, and other support" and a monthly social skills

group—both of which were reasonably aimed at addressing his aforementioned behaviors

of concern.

    This pattern continued throughout the following year and a half: H.L. would exhibit

some particularly disruptive behavior, the District would reassess his performance, the IEP

Team would quickly convene, Parents and H.L. would provide input, and the Team would

modify his IEP accordingly.  Time after time, the District solicited input from all key

stakeholders, conducted appropriate evaluations, and updated H.L.'s IEP based on the

findings.  This periodic gathering of information and subsequent updating is exactly what the

FAPE standard demands; the results enabled the District to craft strategies that were

"reasonably calculated" to foster H.L.'s progress.  *Endrew*, 580 U.S. at 399.

When H.L.'s seventh grade year began with quick uptick in disciplinary referrals, the

IEP Team convened a meeting and agreed to conduct an FBA.  The District offered to

implement a number of new strategies aimed at addressing the specific issues that had

arisen.  For example, because H.L. was struggling with homework completion, the District

offered to have an adult assist him at his locker to ensure he was packing his homework

each day.  (Oct. 2018 Rev. IEP at 7.)  Parents declined this offer, along with the offer of a

social skills class, a peer mentor, and initially, visits to the resource room during study hall.

(*Id.* at 4; AD at ¶¶ 40, 41.)

When H.L.'s behaviors progressively worsened despite these interventions, the

District conducted another reevaluation in December 2018, which incorporated the results of

the FBA.  The District had H.L. complete a reinforcement survey, the results of which would

further tailor his IEP to better incentivize his participation and compliance—a prime example

of calculating a behavioral plan "likely to produce progress."  *See K.D.*, 904 F.3d at 254, 255

("The IDEA contemplates educational programs tailored to 'how the child's disability affects

the child's involvement and progress in the general education curriculum.'" (quoting 20

U.S.C. § 1414(d)(1)(A)(i)(I)(aa))).

And with these results in mind, the District again modified H.L.'s IEP in January 2019, this time incorporating a PBSP.  Plaintiffs contend that the District erred in failing to conduct an FBA and implement a PBSP sooner.  To be sure, "[w]hen designing an IEP for a student whose 'educational progress may be impeded by behavioral issues,' school districts must 'consider the use of positive behavioral interventions and supports, and other strategies to address that behavior.'"  *Jack J. through Jennifer S. v. Coatesville Area Sch. Dist.*, No. 17-CV-3793, 2018 WL 3397552, at *11 (E.D. Pa. July 12, 2018) (first quoting *Coleman v. Pottstown Sch. Dist.*, 983 F. Supp. 2d 543, 565 (E.D. Pa. Nov. 22, 2013), *aff'd in part*, 581 F. App'x 141 (3d Cir. 2014); and then quoting 34 C.F.R. § 300.324(a)(2)(i)).  But the IDEA does not "require that a school use a functional behavioral assessment when initially testing students for suspected disabilities."  *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 251 (3d Cir. 2012).  As the Third Circuit has explained,

> The IDEA's only mention of the functional behavioral assessment method is in § 1415(k)(1)(D), which requires use of that technique when a disabled student, who is already being educated pursuant to an IEP, continues to exhibit behavioral problems. This neither precludes nor requires use of a functional behavioral assessment in initial disability evaluations. As with all evaluations, the component testing mechanisms must be determined on a case-by-case basis depending on the suspected disability and the student's needs.

*D.K.*, 696 F.3d at 251 n.7 (first citing 20 U.S.C. § 1414(b)(2)(A)-(C); and then citing 34 C.F.R. § 300.304(b)(1)-(3)).

Other courts in the Third Circuit have rejected appeals by plaintiffs similarly challenging their respective schools' failure to implement PBSPs based on FBAs.  *See S.W.*

46

*v. Abington Sch. Dist.*, No. CV 17-2188, 2018 WL 6604339, at *11 (E.D. Pa. Dec. 17, 2018) (with respect to a child with hyperactivity and ODD, holding that "even though the District did not conduct an FBA and implement a PBSP, it appropriately provided and implemented strategies to address [the child]'s behavior needs"); *Jack J.*, 2018 WL 3397552, at *12; *Coleman*, 983 F. Supp. 2d at 565.  Here, as in those cases, the IEP Team determined that SDIs and other strategies would appropriately address H.L.'s behaviors, at least until some turning point.  *See, e.g., Jack J.*, 2018 WL 3397552, at *12.  Like the students in those cases, H.L. did not initially fall into the category of students for which the IDEA requires an FBA.  *Id.; Coleman*, 983 F. Supp. 2d at 571.  It was sufficient that H.L.'s IEP set forth "other means to address [his] problematic behaviors" until the IEP Team determined an FBA and PBSP were necessary in the fall of 2018.  *Coleman*, 983 F. Supp. 2d at 565.

The PBSP provided H.L.'s educators with more tools to track his performance (*e.g.,* daily tracking charts) and even more strategies for addressing his behaviors (*e.g.,* the "safe pass" and the use of phone privileges as positive reinforcement).  The January 2019 IEP also increased his monthly social worker visits to the maximum number allowed by the District.  Finally, H.L.'s behavioral goal and baseline performance measurement was modified to reflect more specific behavioral observations.  (*See* Jan. 2019 IEP at 37 ("29% inappropriate verbal comments, 54% non-compliant behaviors").)

Even between formal reassessments and IEP Team meetings, District staff were working to monitor H.L.'s progress and assist his teachers.  When implementation of the

47

latest IEP and PBSP proved difficult, H.L.'s case manager met with his teachers to troubleshoot and provide suggestions. (AD at ¶ 74.) His case manager regularly reviewed the teachers' comments in the daily tracking charts and reacted accordingly.

When H.L. was hospitalized in April 2018, the District reacted once more, attempting to convene an IEP Team meeting and agreeing to fund yet another assessment for H.L., this time an IEE. (AD at ¶¶ 83, 84.)

The beginning of H.L.'s eighth grade year brought yet another behavioral decline, and again the District responded quickly in a calculated manner. H.L.'s behaviors of concern were specific to his English and reading classes, so the District accommodated him by allowing him to take those classes in the learning support room. (Sept. 2019 Rev. IEP at 3.) Again, the District addressed a behavioral issue with a targeted response that was "reasonably calculated" to minimize those specific disruptions to his education and enable him to make progress in his English and reading classes.

Finally, upon receipt of the IEE Report, the IEP Team convened again. The District acknowledged how severely H.L.'s behaviors were now impeding his education, and agreed to fund his placement at the private school of Parents' choice.

In summary, and understanding the IDEA does not mandate an "ideal IEP," only one that was reasonable at the time, *Endrew*, 580 U.S. at 399, the District fulfilled its obligation. The District "was willing and able to review and revise [H.L.]'s IEPs throughout [his] education." *K.D.*, 904 F.3d at 256. District staff responded to H.L.'s disruptive behaviors

with strategies that were specifically targeted to address them, and used incentives they reasonably believed would motivate him.  Over and over again, the District modified H.L.'s IEP to ensure it remained "reasonably calculated to enable [him] to make progress appropriate in light of [his] circumstances." *Endrew*, 580 U.S. at 399.  That H.L.'s behaviors worsened does not mean they were not assessed or addressed.  Plaintiffs' first argument is accordingly without merit.  (Doc. 12-2 at 9.)

### ii. Whether Behavioral Goals Were Appropriate

Plaintiffs also challenge the appropriateness of H.L.'s behavioral goals.  They argue the use of disciplinary referrals to measure H.L.'s progress on his behavioral goal was not appropriate because "the teacher[-]documented behaviors do not correspond to the disciplinary referrals" he received.  (Doc. 12-2 at 11.)  In essence, their concern is that H.L. exhibited a number of poor behaviors each day that did not result in a disciplinary referral and thus were not measured, because as the IEE Report illustrates, teachers had to "pick battles."[15]  (IEE Report at 25.)  They also argue the behavioral goal was based on "unreliable, immeasurable data" and was "entirely subjective in nature." (*See* Doc. 12-2 at 11.)

Plaintiffs' argument improperly embraces the ideal over the reasonable, and the IDEA does not require an ideal IEP. *Endrew,* 580 U.S. at 399.  First, while the number of

---

[15] The Court notes that H.L.'s mother voiced the opposite concern in October 2018, when she emailed the social worker to express her belief that "minor issues [were] being made into disapline [sic] referrals."  (Doc. 8-8, S-38 at 2.)

disciplinary referrals did not capture every noncompliant act, the number was zero when his behavior was generally good, and it rose as his behavior worsened.  It was an accurate indicator of when the IEP Team needed to step in and reassess.  Second, all of H.L.'s IEPs also provided that his progress would also be measured by daily teacher observation.[16] Understanding the District had a finite number of resources and the IEP need not be ideal under *Endrew*, these are reasonable approaches to measuring compliance in the classroom.

Importantly, Plaintiffs' argument also requires impermissible analysis-in-hindsight. *K.D.*, 904 F.3d at 255.  They base their argument on the results of Dr. Della Toffalo's in-school observation of H.L., as recorded in the IEE Report which was not completed until September 2019.  But the Supreme Court has made clear that "crafting an appropriate program of education requires a *prospective* judgment by school officials." *Endrew*, 580 U.S. at 399 (citing *Rowley*, 458 U.S. at 207) (emphasis added).  The results of the IEE

---

[16] Plaintiffs also emphasize the general "lack of accurate and detailed data collection" and highlight specific concerns, *e.g.*, that the daily tracking charts contained "no details about the nature of [H.L.]'s behavior" and only recorded "whether or not [he] met his goal and what antecedents were used." (Doc. 12-2 at 13.)  This is another distinction between reasonable and ideal.  A school's record-keeping system need not be perfect, as long as the imperfections "do not prevent [the student] from receiving meaningful educational benefits." *See S.W.*, 2018 WL 6604339, at *11.  Among other information, every IEP revision was based on input from all of H.L.'s educators who interacted with him daily.  After January 2019, decisions were influenced by the results of teachers' daily tracking charts. (Jan. 2019 IEP at 46.)  And the number of disciplinary referrals was used to track the most severely disruptive of H.L.'s behaviors.  The Court agrees with ALJ Jelley that this information was sufficient on which to base IEPs consistent with the IDEA.

cannot render H.L.'s earlier IEPs unreasonable for having failed to predict what the IEE might uncover.

Plaintiffs further contend the relative consistency of H.L.'s behavioral goal over time is evidence that the District did not provide a FAPE. This is not so. First, his behavioral goal was not unchanged. The Team repeatedly modified it to reflect changed circumstances. In June 2018, the baseline performance was modified. (June 2018 IEP at 27.) In January 2019, the goal was altered to specify the desired behaviors: "engage in compliant behaviors (following rules/directions) when given a demand/task and not make inappropriate verbal comments to avoid school tasks and gain attention," and provide more specific baseline performance: "baseline 29% inappropriate verbal comments, 54% non-compliant behaviors[,] [twelve] discipline referrals." (January 2019 IEP at 37.) In September 2019, the IEP split his goal into a "Task Completion Goal" and a "Behavior Goal," and changed the method of measurement to reflect the District's shift away from using disciplinary referrals. (Sept. 2019 Rev. IEP at 3.) Finally, H.L.'s IEP at YBEC was modified to measure his progress using "daily point sheets." (Dec. 2019 YBEC IEP at 17.)

Second, to the extent the behavioral goal was similar year over year, striving for increased compliance remained appropriate and reasonable in light of H.L.'s circumstances. Plaintiffs compare this case to *Matthew B v. Pleasant Valley School District*, wherein this Court cited the school's repeated use of the same goals as evidence supporting the ALJ's decision that the student had not been provided a FAPE. No. 3:17-CV-2380, 2019 WL

51

5692538, at *12 (M.D. Pa., Nov. 1, 2019).  But in *Matthew B.*, the problem was that the

repeated goals had already been "nearly mastered."  *See id.* at 11.  Plaintiffs have not

suggested, nor does the Record indicate, that H.L. ever mastered his behavioral goal of

increasing compliance in the classroom (or the versions of the goal that followed).  The

IDEA does not reward schools for trying different goals for the sake of variety, and the

District's use of similar goals over time was reasonable.

And third, Plaintiffs improperly focus solely on the consistency of the behavioral goal

and disregard the numerous other strategies incorporated into H.L.'s IEPs, described *supra*,

that were implemented and modified over time.  H.L.'s IEPs provided far more than a single

behavioral goal, and all of the strategies they employed together provided a FAPE.

### iii. Whether ALJ Jelley Ignored District Staff Testimony Regarding Lack of Progress

Finally, Plaintiffs contend ALJ Jelley "ignore[d] District staff admissions regarding the

lack of progress of [H.L.] and insufficiency of the District's plan." (Doc. 12-2 at 9.)  Plaintiffs

specifically argue that ALJ Jelley should have "consider[ed] the admissions" of H.L.'s 2018–

19 case manager.  (*Id.* at 14.)  According to Plaintiffs, those admissions show that the case

manager's "analysis of the daily teacher's report revealed that the SDI contained in the IEP

were not working."  (*Id.*)  Even assuming ALJ Jelley ignored this testimony, this argument

fails.  Plaintiffs' argument suggests that by disregarding this testimony, ALJ Jelley's decision

incorrectly portrays H.L.'s behavior as improving over time, and moreover, that whether H.L.

made progress is dispositive.  The Court disagrees in both respects.  While the

Administrative Decision describes some ups and downs, it makes clear that overall, H.L.'s

behavior *worsened* over time.  It is understandably frustrating for Parents that H.L.'s

behavior trended this way despite the District's efforts, but it does not mean the District

failed to provide a FAPE.  "[W]hether a district provided a FAPE turns on whether the child

received an IEP that 'enable[d] the child to make progress,' not whether the child actually

made progress." *Isabelle K. v. Manheim Twp. Sch. Dist.*, No. 5:19-CV-05517-KSM, 2022

WL 226488, at *15 (E.D. Pa. Jan. 26, 2022) (quoting *Endrew*, 580 U.S. at 399); *D.S. v.

Bayonne Bd. of Educ.*, 602 F.3d 553, 568 (3d Cir. 2010) ("[S]o long as the IEP responds to

the [student's] needs, its ultimate success or failure cannot retroactively render it

inappropriate.") (quoting *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 534 (3d Cir. 1995),

*amended* (Oct. 24, 1995)).

The Court notes that importantly, despite his worsening behaviors, H.L. still

progressed from grade to grade.  That H.L. "did not progress as far or as fast as [Parents]

hoped he would" is unfortunate, but "[the District] met its legal obligation." *S.C. v. Oxford

Area Sch. Dist.*, 751 F. App'x 220, 223 (3d Cir. 2018).

## V. CONCLUSION

In summary, H.L. was not denied a FAPE during the 2017–18, 2018–19, or 2019–20

school years.[17]  Parents have not presented sufficient record evidence to contradict ALJ

---

[17] To the extent Plaintiffs claim H.L. was denied a FAPE after he enrolled at YBEC, they have presented insufficient evidence to prove as much.  ALJ Jelley denied that claim because he did "not have sufficient facts to determine if the regular education academic program [at YBEC] is otherwise

53

Jelley's findings of fact.  Instead, the evidence supports ALJ Jelley's conclusion that H.L.'s

IEPs were appropriate, and that he received a FAPE with respect to each of the three

school years alleged.  Accordingly, Plaintiffs' Motion for Judgment on the Administrative

Record (Doc. 12) will be denied.  Defendant's Motion for Judgment on the Administrative

Record (Doc. 14) will be granted, and judgment will be entered in its favor.  A separate

order follows.


Robert D. Mariani
United States District Judge

---

inappropriate."  (AD at 30.)  Because Plaintiffs chose to present the Court with no new evidence to support
this claim, the same conclusion results here.